522 A.2d 66

**Daniel J. STICKNEY and Harold S. Malseed**

v.

**CHESTER COUNTY COMMUNICATIONS, LTD. t/d/b/a the Main Line Chronicle and Bryn Mawr Home News, Bernard Kramer, Irvin S. Lieberman, Charles Montgomery**

**Appeal of CHESTER COUNTY COMMUNICATIONS, LTD. t/d/b/a the Main Line Chronicle and Bryn Mawr Home News, Irvin S. Lieberman and Charles Montgomery.**

Superior Court of Pennsylvania.

Argued June 25, 1986.

Filed March 4, 1987.

Samuel E. Klein, Philadelphia, for appellants.

John M. Gallagher, Jr., Media, for appellees.

Before OLSZEWSKI, HOFFMAN and ROBERTS, JJ.

ROBERTS, Judge:

This appeal is from the denial of post-trial motions after a jury verdict in a libel action against Chester County Communications (doing business as *The Main Line Chronicle*), Irvin S. Lieberman (publisher), and Charles Montgomery (reporter). The jury found that appellees Daniel Stickney and Harold Malseed, both Haverford Township police officers, were defamed in a series of seven articles published in

the *Chronicle* during 1975 and 1976. The articles related to three incidents in which unnecessary force was allegedly used against juveniles. Stickney was involved in all three while Malseed was involved only in one. Verdicts were returned in favor of Stickney in the amount of $100,000 and in favor of Malseed in the amount of $50,000. Appellants contend that the evidence was insufficient to establish that the articles were published with actual malice. We conclude that the record adequately supports the jury's verdicts, and accordingly we affirm.

On review from a denial of a motion for judgment n.o.v. in a libel action, our task is:

> to make an independent examination of the evidence adduced to determine if it was constitutionally sufficient to warrant a finding by the jury of actual malice, and in so doing, the evidence, together with all reasonable inferences therefrom, must be considered in the light most favorable to the verdict winner, here the plaintiff. If it is not sufficient, [the defendant] is entitled to judgment n.o.v.

*Sprague v. Walter*, 357 Pa.Super. 570, 580–581, 516 A.2d 706, 716–717 (1986), *quoting Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 458, 273 A.2d 899, 912 (1971).

The incident which precipitated the series of articles occurred on February 3, 1975, when Stephen Fischera was observed operating an unlicensed motorcycle on a public roadway. Stickney and Malseed, who were patrolling in an unmarked police van, attempted to stop Fischera. A chase ensued, eventually leading into a residential development from which there was only one exit. Stickney got out of the van to block the exit while Malseed continued to pursue Fischera. A few minutes later, Fischera came around a corner driving the motorcycle directly at Stickney. Fearing for his own safety, Stickney fired a shot at the front tire of the cycle compelling Fischera to stop. When Stickney, Malseed, and two other police officers attempted to take Fischera into custody, a violent struggle followed in which one of the other officers was kicked in the groin. Fischera, attempting to tear away from the officers, fell face-first

onto the ground, injuring himself. He was eventually handcuffed, and treated at a hospital. He was subsequently adjudicated delinquent as a result of the foregoing incident.

A second incident concerned the arrest of Joseph Concordia. Stickney and another officer were suspended for handcuffing Concordia in violation of a police directive not to handcuff juvenile offenders. The suspensions were later vacated by a Civil Service Board which reviewed the case and found that Concordia's behavior warranted handcuffs because of the risk of serious injury to the officers.

The third incident involved the accidental shooting of Michael Pedano. Pedano was a passenger in a car which had been stopped by Stickney and other officers because it matched the description of a car which had been used in an armed robbery. With Pedano leaning against the car, Stickney attempted to frisk him with one hand while holding his shotgun in the other. Pedano turned and tried to grab Stickney's pistol from its holster, at which time the shotgun accidentally discharged injuring Pedano in the head.

The series of articles in the *Chronicle* painted a vastly different picture of these incidents. Headlines referring to the Fischera incident included:

"Police Pair Mash Biker's Face, Admit Pistol Shot"

"Boy's Savage Beating Under Investigation"

"Sequel to Savagery of Havertown Police"

The articles consistently referred to the incident as a "brutal beating," and one article stated that the police officers "smashed in the face of a 17–year-old boy, roughed him up and fired shots." Similarly, the articles referred to the Concordia incident as a "beating," and the Pedano incident as a "shotgun shooting and assault."

Prior to publishing the articles in question, appellants made virtually no attempt to corroborate or contradict the allegations of police brutality. Most notably, none of the officers involved in the Fischera incident were contacted. The only attempt to present a police version of it was the inclusion, in two of the articles, of accounts attributed to Haverford Police Captain Rush. The first article in the

series, dated February 12, 1975, cited Captain Rush as stating that:

> the injuries the boy received to his face, . . . were believed to have occurred when the youth was wrestled to the ground by the policeman and struck his face. on the dirt.

A later article dated January 7, 1976 reported that:

> Captain Rush said in an interview that the boy's injuries apparently occurred when he was wrestled to the ground by a policeman who rubbed his face in the dirt.

These reports were both based on an interview of Rush by appellant Montgomery. Montgomery testified that he understood Rush's account as being that Fischera's injuries resulted from an accidental contact with the ground.

Appellants' decision to report as fact the victims' allegations of police brutality, without conducting any further investigation, was contrary to their own policy of seeking as much corroboration as possible in articles of this nature. That decision to publish mere allegations as fact was made in spite of appellant Montgomery's own testimony that (1) Fischera "didn't sound too swift," (2) his previous opinion of Stickney was that he "was one of the best cops in the Haverford Township Police Department," and (3) the fact that Fischera had reportedly apologized to officers at the hospital and admitted that he was wrong.

Appellants also reported that Fischera had suffered welts on the back of his head, which injuries were inconsistent with the police officers' version of the incident. The report was made without the benefit of any official verification of the injuries Fischera actually sustained. Actually, Fischera suffered no such injuries but rather was wearing a helmet until the time he was placed in a police car.

Appellants also made several allegations of their own in the series of articles. In a March 19, 1975 article, they accused Haverford Township police of filing assault and battery charges against Fischera in retaliation for his allegations of brutality. In January 7, 21 and February 4, 1976 articles they accused the police of "hushing up" the Fischera and Pedano incidents. In relation to the Concordia

incident, they reported that the officers' suspensions were vacated as a result of "political influence." Appellants offered no basis for any of these allegations.

Finally, the *Chronicle* articles consistently referred to a Police Tactical Unit in which Stickney had been a member, as being better known as the "Gestapo Squad." Several witnesses, including appellant Lieberman, testified that prior to the *Chronicle* articles, they had never heard of such a nickname for the unit.

[1, 2] For a public figure [1] to recover in a libel action, he must establish that the complained of articles were published with "actual malice." This requires striking a balance between the public's interest in being informed about public officials and public affairs and the competing interests of those who have been defamed in vindicating their reputations. The standard can be satisfied "only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). *See also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).

■ The term "reckless disregard" cannot be fully encompassed in one infallible definition. In the present case, however, we find several factors which when considered together, present clear and convincing proof that the articles were published with a reckless disregard for the truth.

The first factor which we consider is appellants' decision to publish the allegations against Stickney and Malseed as fact, without further investigation or corroboration. It is well settled that a publisher's failure to investigate in itself is insufficient to establish actual malice. *Hepps v. Phila-*

1. Appellees, as officers in the Haverford Township Police Department, were properly deemed to be public officials subject to the actual malice standard. *See Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super. 475, 448 A.2d 6 (1982); *Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super. 588, 422 A.2d 625 (1980).

*delphia Newspapers, Inc.*, 506 Pa. 304, 321, 485 A.2d 374, 388 (1984), *reversed on other grounds* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

> reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

Here, however, the record establishes more than a simple failure to investigate. The allegations involved were clearly serious enough to warrant some attempt at substantiation, especially in light of appellant Montgomery's own perception and opinion of both Fischera and Stickney, and the report that Fischera had apologized to the officers and admitted he was wrong. Appellants' failure to investigate where they had such obvious reasons to doubt Fischera's veracity and the accuracy of his allegations manifests a reckless disregard for the truth. *See St. Amant v. Thompson, supra*, 88 S.Ct. at 1326. *See also, Kuhn v. Tribune-Republican Publishing Co.*, 637 P.2d 315, 319 (Colo.1981) and the cases cited therein.

A second factor to be considered is the unexplained distortion of Captain Rush's account of the Fischera incident. While the presentation in the first article may contain some ambiguity, the January 7, 1976 article leads the reader to conclude that Rush believed that Fischera's face was intentionally "rubbed" into the dirt. This is in direct conflict with appellant Montgomery's testimony that Rush stated that the contact occurred accidentally. A jury could reasonably have inferred a reckless disregard for the truth from this distorted publication.

Third, appellants' accusations of vindictive prosecution in the Fischera incident, of "hush ups" of the Fischera and Pedano incidents, and of "political influence" in the Concor-

dia incident, without any factual basis to support them, clearly evidence a reckless disregard for the truth. Similarly, the jury could reasonably have inferred that the references to the Tactical Unit of which Stickney had been a member, as being known as a "Gestapo Squad," was a calculated falsehood and as such evidence of actual malice. *See Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 252-3, 95 S.Ct. 465, 470-1, 42 L.Ed.2d 419 (1974).

Review of the entire record presents "clear and convincing proof" that the articles in question were published with a reckless disregard for the truth. Thus the evidence is constitutionally sufficient to support the jury's finding of actual malice.[2]

Judgments affirmed.

**2.** Appellants also contend that the trial court erred in allowing the introduction of allegedly inadmissible hearsay. At trial, Ethel Kramer was permitted to testify to a conversation she overheard between her husband Bernard Kramer (deceased editor of the *Chronicle*) and appellant Lieberman prior to the publishing of the first article. She testified that she heard her husband warn Lieberman that the article's reference to "Gestapo Squad" was "too risky" and that "you can't use language like Gestapo Squad when you talk about the police." The statements were offered to evidence Lieberman's state of mind and not as proof of the matter asserted. Since no assertive or testimonial use was sought to be made of them, they were admissible so far as the hearsay rule is concerned. *See* 6 Wigmore, Evidence, §§ 1788-90 (1976); Brown, Pennsylvania Evidence, pp. 129-131 (1949).